**INSTITUTO NACIONAL DE COMER-CIALIZACION AGRICOLA (INDECA), Plaintiff,**

**v.**

**CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, et al., Defendants.**

**No. 81 C 1934.**

United States District Court, N.D. Illinois, E.D.

Dec. 2, 1983.

On Motion For Reconsideration Jan. 16, 1984.

Kathleen Heenan McGuan, Jerris Leonard & Assoc., Washington, D.C., Edward J. McGovern, Evergreen Park, Ill., for plaintiff.

Matthias A. Lydon, John A. Dienner, III, of Pierce, Lydon & Griffin, Robert L. Tucker of Tucker & Watson, Dennis C. Waldon of Keck, Mahin & Cate, Robert S. Atkins of Freeman, Atkins & Coleman, Duane C. Quaini, Jeffrey Lennard, Joseph A. Lavela of Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., Richard Wynn, New York City, Richard C. Entin of Shapiro, Leder, Kimler, Entin & Werksman, Deerfield Beach, Fla., Gerald D. Mindell, Arthur F. Radke, Patricia T. Adelman, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER[*]

SHADUR, District Judge.

Instituto Nacional de Comercializacion Agricola ("Indeca"), a quasi-national corpo-

---

[*] This is one of two opinions issuing concurrently in this action (the other deals with affirmative defenses asserted by the Continental Bank). In each instance the most valuable analytical input for this Court's consideration came from its law

ration organized under Guatemalan law, has as part of its responsibility the purchase on international markets of foodstuffs and agricultural staples for the Guatemalan people. It sues a group of defendants for an allegedly fraudulent scheme in which Indeca was bilked of over $5 million in its attempted purchase of 6,000 metric tons of black beans that proved to be nonexistent.[1]

Indeca has now moved for summary judgment under Fed.R.Civ.P. ("Rule") 56 against Deborah Bell ("Bell") and Rumex International ("Rumex") on Count I (breach of contract) and against Bell, Rumex, Robert Tucker ("Tucker") and Michael Ball ("Ball") on Count II (fraud). Shirley Nagel ("Nagel") and Quosando Corporation ("Quosando")[2] have moved for summary judgment against Indeca on Counts I, II and VI (asserting a RICO[3] violation). For the reasons stated in this memorandum opinion and order, Indeca's motion is granted and the Nagel-Quosando motion is denied.

### Facts

In July 1980 Indeca sought to purchase a large quantity of black beans. Thomas J. Lipani ("Lipani") learned of Indeca's need and wanted to submit a bid, but he needed a black bean supplier. Lipani spoke with Juan Jose Caceres ("Caceres"), a friend and sometime business associate, who (1) happened to have some connection to Indeca head Carlos Ramirez ("Ramirez") and (2) knew Nagel, who Caceres thought might know where Lipani could purchase the beans. On Caceres' recommendation Lipani communicated with Nagel, who in turn spoke with Bell, a commodities broker doing business as Rumex.

Between July 28 and August 19 numerous telexes were sent, either bearing Nagel-Quosando's name (authorship of those is disputed by Nagel) or directed to Nagel-Quosando, regarding the sale of black beans.[4] Nagel concededly wrote an August 19 letter appointing Lipani as Quosando's representative in Guatemala (that letter was later rejected by the Guatemalan government for its informality). Bell too. sent a letter, this one appointing Lipani as Rumex' representative.

Nagel said in her deposition she had never seen *any* of the telexes before the start of the 1981 FBI investigation into the transaction, though she admitted writing the Lipani appointment letter. Nagel also testified she thought she was out of the transaction once the Guatemalan govern-

---

clerk, Linda Rusch, rather than the parties' submissions (extensive though they were).

1. Anyone unfortunate enough to have been compelled to read any of this Court's many earlier opinions in this case will recognize this standard introductory paragraph.

2. Quosando was originally formed as a holding company for Nagel's children's property but has been involuntarily dissolved by the State of Arizona (Nagel Dep. 13). Because Quosando's only actions were those taken for it by Nagel, the remainder of this opinion will (simply for convenience, and not reflecting any substantive decision) refer only to Nagel's actions and treat Nagel and Quosando as one.

3. RICO is shorthand for the Racketeer Influenced and Corrupt Organizations chapter (18 U.S.C. §§ 1961–68) of the Organized Crime Control Act of 1970. Count VI charges a violation of 18 U.S.C. § 1962(c).

4. Those telexes comprised:

1. Caceres' July 28 telex to Nagel and Bell asking for a quote of price and conditions;
2. Nagel-Quosando-Rumex' July 31 telex to J. Castigon (Lipani's associate) offering a quote and requesting a letter of credit be opened in favor of Nagel at a Phoenix bank;
3. Nagel-Quosando-Rumex' August 1 telex to Lipani urging quick acceptance of the offer;
4. Nagel-Quosando's August 13 telex to Ramirez with a detailed offer of sale;
5. Ramirez' August 14 telex to Nagel-Quosando accepting the offer;
6. Lipani's August 14 telex on behalf of Nagel-Quosando-Rumex to Ramirez confirming acceptance of offer;
7. Bell's August 18 telex on behalf of Quosando-Rumex to a "Mr. Parker" instructing that a letter of credit be opened in favor of Quosando;
8. Lipani's August 19 telex to Bell and Nagel requesting bean samples; and
9. Bell-Nagel's August 19 telex to Ramirez stating Rumex and Quosando were "acting as one" in this transaction.

ment rejected the Lipani appointment letter. In any event, on August 22 a written contract ("Indeca-Rumex contract") was entered into by Ramirez on behalf of Indeca and Lipani on behalf of Rumex for the sale of black beans on virtually the same terms as stated in the purported "Nagel-Quosando" telexes, except for changes in the port of origin and the bank at which the letter of credit should be opened. Neither Nagel nor Quosando is mentioned in the Indeca-Rumex contract.

Thereafter Bell negotiated a contract dated September 4 with Irving Pheterson ("Pheterson") doing business as International Association of Grocers, Inc. ("IAG"), under which Pheterson agreed to supply the beans for sale to Indeca. Rumex had represented in the Indeca-Rumex contract it already owned the beans. Pheterson testified in his deposition he had never heard of Nagel or Quosando.

Another provision of the Indeca-Rumex contract required Indeca to open a letter of credit ("Letter") at Continental Illinois National Bank and Trust Company of Chicago ("Continental"),[5] with delivery of the beans to occur within 30 days of such opening. Though the Letter was paid the beans were not delivered. There was a flurry of telexes through the end of 1980 among Rumex, Bell, Lipani, Caceres and Ramirez, with repeated promises of delivery by Rumex and Bell—never carried out. Then Tucker's January 15, 1981 letter told Indeca the beans would not be delivered, as Rumex had been defrauded by its supplier.

Part of Indeca's Count II fraud claim asserts Tucker's, Bell's and Ball's participation in presenting false documents to Continental to obtain payment of the Letter. Those three defendants have been convicted on nine counts of wire fraud under 18 U.S.C. § 1343, based upon their participation in such presentation and misrepresentations to Indeca regarding the bean shipments. All of them have appealed their convictions.

*Indeca's Motion*

1. *Count I: Breach of Contract*

 To prevail on its breach of contract claim against Bell and Rumex, Indeca must prove the existence of the contract, Bell's and Rumex' breach, Indeca's damages as a result of that breach and Indeca's performance of all its conditions precedent. *Thilman & Co. v. Esposito*, 87 Ill.App.3d 289, 296, 42 Ill.Dec. 305, 311, 408 N.E.2d 1014, 1020 (1st Dist.1980). To meet that burden Indeca has submitted:

1. the affidavit of Ana Imelda Garavito Castellanos ("Garavito Affidavit"), custodian of all Indeca records regarding the transaction, which identifies the following documents;

2. a translated copy of the Indeca contract;

3. Tucker's January 15, 1981 letter admitting Rumex cannot deliver;

4. Indeca's application for the Letter;

5. issuance by Banco de Guatemala ("Banco") of the Letter, later confirmed by Continental; and

6. Banco's liquidation of the Letter to Rumex.

Tucker has moved to strike the Garavito Affidavit, claiming (1) her identification of its attached documents is not based on her personal knowledge and (2) the affidavit does not show her competence to testify. Essentially Tucker is objecting to Indeca's effort to authenticate the documents.[6] Even assuming arguendo the validity of Tucker's objections to the Garavito Affidavit, the documents essential to Indeca's breach of contract claim have been authenticated in other permissible ways. Under Fed.R.Evid. 902(8) the Indeca-Rumex contract is self-authenticated as a notarized document. By his own May 25, 1983 submission Tucker (1) authenticated his January 15, 1981 letter to Indeca (Tucker Aff. ¶ 21) and (2) submitted Banco's liquidation of the Letter in Rumex' favor to support

---

5. See this Court's earlier opinion regarding the claims against Continental, 530 F.Supp. 279 (N.D.Ill.1982).

6. Tucker has not raised any other evidentiary objection to the documents.

Tucker's own statement of operative facts (Tucker May 23 Exs. 9, 12). All those documents are thus effectively established, and they in turn establish the existence of the Indeca-Rumex contract, Indeca's fulfillment of its conditions precedent, Rumex' breach and Indeca's resultant damages. Indeca has clearly satisfied its burden on Count I.

Moreover Bell and Rumex have elected not to submit any evidence in opposition to those matters, but simply to rest on their pleadings. Without more, summary judgment could properly be entered against Bell and Rumex on Count I. *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir. 1983), *cert. denied,* — U.S. —, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983).

However, Tucker's submission in opposition to Indeca's Count II summary judgment motion has asserted an *in pari delicto* defense relevant to both Counts I and II.[7] Because of the identity of issues, further discussion of that defense will be deferred to the more logical place for its treatment: the next section of this opinion.

2. *Count II: Fraud*

Indeca moves for summary judgment on Count II, asserting the collateral estoppel effects of the criminal convictions of Bell,[8] Tucker and Ball for wire fraud under 18 U.S.C. § 1343. That motion compels consideration both of the elements of a civil fraud claim and of collateral estoppel principles.

First, to prevail on its fraud claim Indeca must show (*Almgren v. Engelland,* 94 Ill. App.3d 475, 477, 50 Ill.Dec. 66, 68, 418 N.E.2d 1060, 1062 (1st Dist.1981)):

1. misrepresentation of a material fact

2. made for the purpose of influencing the other party to act,

3. by a person who knew or believed the statement to be untrue,

4. as it was in fact,

5. to a person who believes and relies on the statement.

Indeca asserts the criminal convictions establish all those elements except for its reliance, as to which it submits additional proof.

Again Bell and Rumex offer no evidence in rebuttal, and Ball has made no submission at all. Tucker however raises five points in opposition to the motion:

1. Under Illinois rules of collateral estoppel a criminal conviction is only prima facie evidence, not conclusive evidence, of matters established in the criminal case.

2. Under federal collateral estoppel principles the doctrine is inapplicable here because Tucker, as a criminal defendant, lacked procedural advantages afforded civil litigants.

3. Because the convictions have been appealed, this Court cannot give them preclusive effect.

4. Indeca cannot show it relied on any of Tucker's statements because he made no direct representations to Indeca and he was not involved in presenting false documents to Continental.

5. *In pari delicto,* an issue not litigated in the criminal case, bars summary judgment.

Brief analysis confirms Tucker's only possibly viable point is the last one:

 1. Though Illinois does provide the substantive rules of decision in this diversity case, Illinois collateral estoppel doctrine is irrelevant. This is so because as to a *federal* criminal conviction Illinois choice-of-law rules look to the effect given by *federal* law. *Nathan v. Tenna Corp.,* 560 F.2d 761, 763 (7th Cir.1977). Under

---

7. Tucker, Bell and Rumex have all pleaded that affirmative defense in their answers. It would exalt form over substance to require Bell and Rumex to submit a formal adoption of Tucker's memorandum on the issue. Tucker's argument will therefore be considered as applicable to the Bell-Rumex Count I as well.

8. Indeca argues Bell's conviction should also estop Rumex because Bell was Rumex' principal. *In re Teltronics, Ltd.,* 649 F.2d 1236, 1239 (7th Cir.1981). This Court agrees.

that law such a conviction *conclusively* (not just presumptively) establishes issues actually litigated for purposes of later *federal* civil litigation—like this case. *Id.*

■ 2. Any procedural differences that may exist between criminal and civil cases are not such as to evoke any different collateral estoppel result. Criminal defendants, like civil litigants, plainly have every incentive to litigate their cases fully and vigorously. *County of Cook v. Lynch,* 560 F.Supp. 136, 139 (N.D.Ill.1982).

■ 3. Pendency of an appeal does not alter the preclusive effect of a criminal conviction. *Kurek v. Pleasure Driveway & Park District of Peoria,* 557 F.2d 580, 595 (7th Cir.1977).

■ 4. Tucker need not have made representations directly to Indeca to sustain a fraud action. It suffices if:

(a) Tucker intended the fraudulent statement to reach Indeca and influence its actions.

(b) In fact the statement did reach Indeca, and it relied on the statement to its detriment.

*Roman v. Delta Air Lines, Inc.,* 441 F.Supp. 1160, 1167 (N.D.Ill.1977); *Rozny v. Marnul,* 43 Ill.2d 54, 67, 250 N.E.2d 656, 660 (1969). Of course the statements reached Indeca, and its $5 million of detrimental reliance (discussed hereafter) is what this action is all about. As for the other facets challenged by Tucker, they are directly belied by Tucker's criminal conviction:

1. Indictment Count One ¶¶ 18 and 20 specifically charged Tucker's participation in the presentation of false documents to Continental.

2. Indictment Count Ten was predicated solely on Tucker's (and Bell's and Ball's) knowing presentation, or causing the presentation, of false documents to Continental on September 5, 1980 for the purpose of influencing Continental to pay the Letter.

3. Indictment Count One's wire fraud charge as to Tucker was that he participated in sending, or caused to be sent, a telex to Pheterson September 3, 1980 in furtherance of the scheme to defraud Continental and Indeca, two days before the false documents were presented to Continental.

Tucker was found guilty on all counts by the jury.[9] Those jury findings directly reject Tucker's argument he was not involved in the matter until after the September 5, 1980 document presentation, an argument he is foreclosed (that is, collaterally estopped) from now asserting.

Indeca admits the criminal convictions do not establish Indeca's reliance, a necessary element of civil fraud actions, and that the *in pari delicto* defense was (of course) not litigated in the criminal case. On those matters it becomes necessary to consider the proof in support of Indeca's current motion.

a. *Reliance*

■ On the reliance issue, Indeca submits (1) evidence showing its payment of the Letter and (2) the Caceres Affidavit, which details his communications with Ramirez between October 4, 1980 and January 1981, his telephone calls and telexes to Bell and Tucker between October 4, 1980 and December 1980, and his telephone call to Continental on behalf of Ramirez to inquire about the bean shipment. That evidence makes it clear beyond cavil Indeca acted in reliance on the false representations to its detriment. Accordingly Indeca has established all elements of its civil fraud action against Bell, Rumex,[10] Tucker and Ball. It is therefore entitled to summary judgment unless the claimed *in pari delicto* defense raises a genuine issue of material fact.

b. *In Pari Delicto*

■ *In pari delicto* is a defense that bars a plaintiff who has participated in

---

9. Tucker has recently submitted copies of his brief and statement of facts filed in support of his appeal from that criminal conviction. Those filings confirm the factual statements

(and implicitly the legal analysis) in the text of this opinion.

10. See n. 8.

wrongdoing from recovering for injury resulting from such wrongdoing.[11] *Corti v. Fleisher*, 93 Ill.App.3d 517, 532, 49 Ill.Dec. 74, 86, 417 N.E.2d 764, 776 (1st Dist.1981); *Stevens v. Silver Manufacturing Co.*, 41 Ill.App.3d 483, 488, 355 N.E.2d 145, 151 (2d Dist.1976); *Tarasi v. Pittsburgh National Bank*, 555 F.2d 1152, 1156–57 (3d Cir.1977). Though the doctrine itself is unimpeachable, the facts do not sustain its applicability to Indeca.

■ Tucker has submitted deposition testimony of Paul Rojas Cuyos ("Rojas"), formerly assistant to Indeca's General Manager, to establish the Indeca-Rumex contract was entered into illegally by Ramirez. Rojas testified Guatemalan law required Indeca to get competitive bids, to have the contracting party put up a bond, to get a resolution on the contract from the Indeca Board of Directors, and to submit the contract to the Comptroller of Accounts. Tucker presented some evidence those requisites were not met in this case (Tucker's Oct. 17, 1983 Exs. 4, 5) and argues the Indeca-Rumex contract is illegal. Testimony also establishes, and Indeca admits, Ramirez demanded and was paid a bribe of $240,000 to let the contract to Rumex.

Tucker contends Ramirez participated in defrauding Indeca, Indeca is bound by Ramirez' actions and thus Indeca is *in pari delicto* with the defendants and cannot recover. On the other hand, Indeca retorts it is not bound by Ramirez' fraud because Ramirez was acting for his own benefit— and not within the scope of his agency—in accepting the bribe and thereby awarding the contract to Rumex, matters wholly outside the knowledge of Indeca itself.

Under basic principles of agency law, "knowledge will not be imputed [to the principal] when the agent has a motive or interest in concealing facts from the principal," as when the agent engages in illegal or unauthorized conduct. *McKey & Poague, Inc. v. Stackler*, 63 Ill.App.3d 142, 152, 20 Ill.Dec. 130, 137, 379 N.E.2d 1198, 1205 (1st Dist.1978). To raise a fact issue as to the *in pari delicto* defense, Tucker must present some evidence that would show Indeca knew either (1) of Ramirez' illegal conduct in particular or (2) perhaps of a general practice of bribery or illegality, such as to create the reasonable inference of knowledge. *See CFTC v. Premex, Inc.*, 655 F.2d 779, 784 & n. 10 (7th Cir. 1981).

■ Tucker's evidence however points in just the opposite direction. Caceres actually testified Ramirez had expressed his concern about Guatemalan officials, specifically that country's president, finding out about Ramirez' receipt of the bribe (Oct. 6, 1983 Dep. 167–75). Caceres also testified as to his own dealings with Indeca when he was a Cargill employee and purchased grain from Indeca: He was never required to make payments to Indeca officials nor did he have any knowledge Indeca officials generally demanded and received payments (Dep. 100–03). In short Tucker has presented no facts whatever that would support any reasonable inference Indeca knew of Ramirez' actions, or even of a general practice of bribery so as to bind Indeca to Ramirez' fraud and support the *in pari delicto* defense.[12]

### 3. *Conclusion as to Indeca's Motion*

Accordingly Tucker, Bell, Rumex and Ball have failed to raise any genuine issues

---

**11.** Indeca has not raised any sovereign immunity or act of state defense to the *in pari delicto* contention. Nor does it appear it should be allowed to claim such immunity, *see* Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. §§ 1602–11, given its use of United States courts to assert its claim and the commercial nature of the transaction. *See also In re Oil Spill by "Amoco Cadiz" off Coast of France*, 491 F.Supp. 161, 169 (N.D.Ill.1979).

**12.** This Court will not make the apparently requested inference Guatemalan officials engage in bribery as a matter of course because Guatemala is an unstable Central American country. That "banana republic" philosophy cannot take the place of proof in a lawsuit, either via some type of judicial notice or otherwise. Under Rule 56 principles the party opposing summary judgment is entitled to all reasonable factual inferences—but they must be inferences based on fact and not on speculation or jingoism.

of material fact as to either Count II or the previously reserved issue on Count I. Indeca is entitled to summary judgment on both counts as to all those defendants.

### Nagel-Quosando Motion

#### 1. Counts II and VI

■ To obtain summary judgment, Nagel-Quosando [13] of course bear the burden of establishing no genuine issue of material fact exists, with all reasonable factual inferences to be drawn in Indeca's favor. *Cedillo v. International Ass'n of Bridge & Structural Iron Workers, Local Union No. 1*, 603 F.2d 7, 10–11 (7th Cir.1979). Nagel-Quosando have not sustained that burden.

Nagel argues (Count II) she committed no fraudulent actions (in effect, an argument she had no intent to defraud) and (Count VI) she is not part of an "enterprise" under RICO, 18 U.S.C. § 1961(4). Those arguments rest on (1) Nagel's deposition testimony, in which she denied knowledge of the telexes and said she thought she was out of the deal after August 19 and (2) other parties' lack of knowledge of Nagel.

In Illinois the actor's intention is an integral part of a fraud claim. *Exline v. Weldon*, 57 Ill.2d 105, 110, 311 N.E.2d 102, 105 (1974); *Paskas v. Illini Federal Savings & Loan Ass'n*, 109 Ill.App.3d 24, 32, 64 Ill. Dec. 642, 647, 440 N.E.2d 194, 199 (5th Dist.1982). Nagel-Quosando must show there is no genuine issue of fact as to her intent, with all reasonable inferences drawn in Indeca's favor.

■ Under RICO "the term 'enterprise' ... encompasses both legal entities and illegitimate associations-in-fact." *Russello v. United States*, —— U.S. ——, ——, 104 S.Ct. 296, 301, 78 L.Ed.2d 17 (1983).[14] If such an association-in-fact has a common purpose, continuity of structure and personnel, and a structure distinct from the pattern of racketeering, it is a RICO enterprise. *United States v. Lemm*, 680 F.2d 1193, 1198 (8th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983). To prevail on Indeca's RICO claim now, Nagel must show it could not be found she shared a "common purpose" with Bell.[15]

■ Whether Nagel had such "common purpose" with Bell in the RICO sense is much like the question of Nagel's intent for purposes of the fraud claim. As to both those issues, although Nagel's deposition testimony supports her position, the series of telexes and her Lipani appointment letter—looked at alone, as they must be on the Nagel-Quosando motion—could reasonably produce the inference Nagel-Quosando were involved in the transaction.

By definition only Nagel can testify about her own subjective state of mind.[16] Because the trier of fact is not obligated to accept that testimony even though technically "uncontradicted," the presence of other evidence that could reasonably lead to the opposite inference bars summary judgment. *Thornton v. Evans*, 692 F.2d 1064, 1075 (7th Cir.1982); *Conrad v. Delta Air Lines, Inc.*, 494 F.2d 914, 918 (7th Cir. 1974).[17]

---

**13.** See n. 2.

**14.** Nagel's assertion she was not part of a legal entity (a joint venture) and therefore could not be part of a RICO "enterprise" is thus without merit.

**15.** Nagel's contrary position, that Indeca must now prove Nagel's fraudulent intent and "common purpose" with Bell, is without merit. Indeca's only burden in defending against summary judgment is to raise factual issues, so that the trier of fact *might* find in Indeca's favor on those issues.

**16.** Judge Learned Hand's famous "twenty bishops" aphorism puts the matter far more eloquently. *Hotchkiss v. National City Bank of New York*, 200 F. 287, 293 (S.D.N.Y.1911), *aff'd*, 201 F. 664 (2d Cir.1912), *aff'd*, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913).

**17.** Needless to say, this holding does not imply any opinion about how the disputed issues should or will ultimately be resolved by the trier of fact.

## 2. *Count I*

Nagel contends she is not a party to the Indeca-Rumex contract and thus cannot be liable for its breach. Indeca retorts it was Nagel's intention to be a party to such contract even though Lipani signed the formal agreement on Rumex' behalf.

Nagel's motion raises an issue as to the effect of the series of telexes among Nagel-Quosando, Lipani and Ramirez (see n. 4). Nagel appeared as the named sender of the August 13 telex, which made a detailed offer to sell beans (including price, quantity, credit terms, shipping and unloading requirements) and went on to say:

> In the event of acceptance of our offer, we will have for the signing of the contract a duly and legally authorized representative 24 hours after acceptance of contract.

Ramirez' August 14 telex accepted that offer:

> Hope to formalize the negotiation with the corresponding contract. Your legally authorized representative.

On the same day Lipani telexed confirmation of Ramirez' acceptance:

> Likewise we are pleased to inform you that we hope to be loading next week for which we ask you to proceed to open as soon as possible a letter of credit. We hope to have a duly and legally authorized representative in Guatemala on Monday 18 for which we request that you proceed to prepare a contract. Again thanking you for your purchase.

Further telexes before the August 22 contract date requested the Letter be opened in favor of Quosando (August 18) and said Rumex and Quosando were acting as one (August 19). On August 22 Banco in fact opened the Letter in favor of Rumex.

Although it is true Lipani executed the August 22 contract only in Rumex' name, the inquiry does not end there. Two possibilities could nonetheless bind Nagel-Quosando as contracting parties:

1. If the offer and acceptance embodied in the telexes themselves created the binding contractual relationship, the trier of fact could reasonably find Nagel-Quosando the contracting party.[18]

2. Even if the August 22 Indeca-Rumex agreement is viewed as the only contractual document, the factfinder could reasonably find Nagel-Quosando bound as a disclosed principal.

 As to the first of those alternatives, the contemplation of a formal agreement does not of necessity render prior agreements "mere negotiations." At least that is so where it is clear the formal agreement will be substantially based on the same terms as the prior agreement, as is the case here. *Interway, Inc. v. Alagna,* 85 Ill.App.3d 1094, 1097–98, 41 Ill.Dec. 117, 120, 407 N.E.2d 615, 618 (1st Dist.1980). In such a situation the parties' intent determines whether (1) the prior agreement has contractual effect or (2) execution of a formal agreement is a condition precedent to formation of a binding contractual relationship. *Id.,* 85 Ill.App.3d at 1098, 41 Ill.Dec. at 120, 407 N.E.2d at 618. If the prior agreement's language is ambiguous as to the effect of the later-executed formal agreement, determination of the parties' intention is a fact question. If such language is unambiguous, such determination of intent is a question of law for the trial court. This Court must decide as a matter of law whether the prior agreement is ambiguous. *Id.,* 85 Ill.App.3d at 1098, 41 Ill. Dec. at 120–121, 407 N.E.2d at 618–19.

 From all the post-August 13 telexes, it is not wholly clear what the parties intended by later execution of the Indeca-Rumex contract. Ramirez' August 14 telex used the phrase "hope to formalize" and the term "negotiation," but both Lipani's August 14 telex and Bell's August 18 telex convey the impression the contract was already formed and a written agreement was a mere formality.

---

**18.** On the latter aspect, this opinion's discussion of the Counts II and VI claims is equally relevant to Count I.

Accordingly the telexes are ambiguous as to the intended effect of the later-executed contract. Under *Interway* questions of fact are presented regarding the parties' intention as to (1) when a binding contractual relationship was formed and (2) consequently, who were the "real" parties to such a relationship.

But that is not the only possible route leading to the same end. Suppose the telexes were considered unambiguous, so the August 22 document were the operative contract. In light of the Bell-Nagel August 19 telex expressly stating Rumex and Quosando were "acting as one," the trier of fact could surely find Rumex executed the August 22 contract both on its own behalf and on behalf of Quosando as its disclosed principal. On that alternative too the question is one of intention—again a question of fact.

Both views of the series of telexes and the August 22 agreement thus pose questions of intent. And like the questions of "fraudulent intent" and "common purpose" under Counts II and VI, the intent of contracting parties for Count I purposes cannot be resolved on this summary judgment motion. *Thornton*, 692 F.2d at 1075; *Conrad*, 494 F.2d at 918.

### Conclusion

Based on the foregoing analysis, there is no genuine issue of material fact as between Indeca and Bell and Rumex on Count I and Bell, Rumex, Tucker and Ball on Count II. Indeca is entitled to a judgment against those defendants on those counts as a matter of law. Nagel-Quosando's motion for summary judgment is denied because of the presence of material factual issues.

## ON MOTION FOR RECONSIDERATION

As this Court has said by way of introduction to all its numerous earlier opinions in this case, Instituto Nacional de Comercializacion Agricola ("Indeca"), a quasi-national corporation organized under Guatemalan law, has as part of its responsibility the purchase on international markets of foodstuffs and agricultural staples for the Guatemalan people. It sues a group of defendants for an allegedly fraudulent scheme in which Indeca was bilked of over $5 million in its attempted purchase of 6,000 metric tons of black beans that proved to be nonexistent.

Most recently this Court's December 2, 1983 memorandum opinion and order (the "Opinion") granted Indeca's motion for summary judgment against Robert Tucker ("Tucker"), Deborah Bell ("Bell"), Rumex International ("Rumex") and Michael Ball ("Ball"). Tucker now moves for reconsideration of the Opinion, and Indeca moves for entry of judgment under Fed.R.Civ.P. ("Rule") 54(b). For the reasons stated in this memorandum opinion and order (which assumes familiarity with the Opinion and its cast of characters), both motions are denied (Indeca's without prejudice to its future reassertion).

### Motion To Reconsider

Essentially Tucker's motion reargues the same points this Court considered carefully and rejected in the Opinion. That misapprehends the limited role of a motion to reconsider:

> The motion to reconsider would be appropriate where, for example, the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court. Such problems rarely arise and the motion to reconsider should be equally rare.

*Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D.Va. 1983). Accordingly each of Tucker's arguments will be stated and dealt with briefly.

### In Pari Delicto

1. Tucker urges Ramirez' knowledge of wrongdoing should be imputed to Indeca solely because Ramirez was a high-level

executive of Indeca. In Tucker's view Indeca is bound by Ramirez' fraud just as Rumex is bound by Bell's conviction for mail fraud (Opinion at 8 n. 8). That comparison ignores a critical factual difference: Indeca is governed by an independent board of directors, while Rumex was merely Bell's alter ego. Tucker would have (say) the massive fraud perpetrated for his own benefit by F. Donald Coster (who was in reality ex-convict Philip Musica) automatically imputed to what was then McKesson-Robbins Corporation, based solely on the existence of the fraud and the high corporate position of the crook. This Court rejected that distorted version of *in pari delicto* in the Opinion, and it does so now.

2. Tucker now says a fact issue is raised as to Indeca's knowledge of the illegality because:

(a) Caceres' testimony established that Guatemala's Minister of Agriculture Edgar Ponciano received part of the bribe money.

(b) Further discovery may establish Ponciano as Chairman of Indeca's Board of Directors.

First, Tucker did not advance this argument in his previously-filed briefs, extensive though they were. Absent any justification for its prior omission, the argument is not proper for a motion for reconsideration. Second, this new contention raises the propriety of allowing further discovery, an issue discussed below.

3. Tucker asserts he has presented evidence (a) the Indeca contract was illegal, (b) Indeca officials knew of such illegality and (c) such knowledge should be imputed to Indeca because of a letter from Indeca to Ramirez detailing the requirements to be met when letting commodities contracts. This Court held that argument insufficient the first time it was made. No language in the letter remotely suggests Indeca's knowledge of Ramirez' past or present misconduct. Tucker would have this Court

raise a fact issue supporting an inference that Indeca knew of past illegalities merely because the letter was written. Such an inference is totally unwarranted, even when all reasonable factual inferences are taken in favor of Tucker as the party opposing summary judgment.

*Indeca's Reliance*

1. Tucker argues Indeca did not *reasonably* rely on any of Tucker's misrepresentations because Indeca officials participated in the fraud and Tucker himself made no representations to Indeca on which they relied. Both arguments have been previously made, specifically considered and specifically rejected (Opinion at 10–11, 13). Tucker has presented no new evidence or legal support for the renewed assertion of the same arguments.

2. For the first time Tucker claims Indeca has not been damaged because it has not yet been required to pay the $5 million to Banco. Such a new argument based on old evidence is wholly improper on a motion to reconsider. Moreover the very evidence Tucker cites supports the fact Indeca *has* been damaged. Rojas' deposition testimony shows (a) Indeca is now liable to Banco and (b) it may become liable to the Guatemalan government instead, if the latter provides funds to pay the obligation to Banco. It is frankly nonsense for a wrongdoer (Tucker) to cause his victim to incur a liability, then say no damages have been sustained because the obligation exists but has not yet been paid.

*Discovery*

Finally Tucker urges summary judgment was inappropriate because he has not yet completed discovery. Further discovery,[1] he says, would support his *in pari delicto* defense. Unfortunately that contention bends the facts beyond recognition, just as Tucker's legal arguments have done with the law.

Rule 56(f) provides a party opposing summary judgment the opportunity to

---

1. Such proposed discovery would take the form of deposing certain unidentified Guatemalan officials and seeking unidentified documents as to

Indeca's general commercial practices and its knowledge of the Indeca contract.

state reasons why he cannot present facts in opposition. On a proper showing the court may delay its decision on the motion pending further discovery.

 Although Tucker seems to believe a blanket rule prohibits entry of summary judgment when discovery is still open, clearly no such rule exists. *Wallace v. Brownell Pontiac-GMC Co.*, 703 F.2d 525, 528 (11th Cir.1983). Rather Rule 56(f) requires a specific showing of what facts might be revealed by further discovery and why the party opposing summary judgment cannot now bring that evidence forward—"particularly where, as here, ample time and opportunities for discovery have already lapsed." *SEC v. Spence & Green Chemical Co.*, 612 F.2d 896, 901 (5th Cir. 1980). Moreover a party cannot forestall summary judgment by contending more discovery is needed without showing diligence in proceeding down the discovery road. See *Over the Road Drivers, Inc. v. Transport Insurance Co.*, 637 F.2d 816, 820–21 (1st Cir.1980).

On March 28, 1983 Indeca filed its motion for summary judgment. On May 25 Tucker requested this Court to stay consideration of such motion pending completion of two basic categories of discovery:

 1. completion of Caceres' deposition and

 2. translation of Spanish documents produced by Indeca.

Tucker then mentioned no other areas of discovery to be completed, save for a vague statement that discovery in the identified areas might lead to further discovery. This Court granted Tucker's requested stay of consideration until those two specified areas of discovery were completed.[2] Thereafter it issued its Opinion December 2, 1983—over eight months after Indeca filed the motion, and over six months after Tucker identified his need for a stay.

Now for the first time Tucker identifies another area of discovery, which would allegedly lead to evidence in support of his *in pari delicto* defense. During the eight months Indeca's motion was pending this Court entered no order restricting Tucker's ability to conduct discovery. Tucker has offered no reasons why such discovery could not have been taken during that time or why he did not previously argue his need for such additional discovery before the motion was ruled upon. See *Bilderback v. City National Bank & Trust Co. of Columbus*, 639 F.2d 331, 332–33 (6th Cir.1981) (per curiam). Tucker's vague May 25 assertion that the then-identified discovery might lead to further discovery does not constitute a sufficient Rule 56(f) showing. See *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 460 F.Supp. 1151, 1153–54 (N.D.Ill.1978).

It was plain from the outset the *in pari delicto* defense and the question of imputing knowledge to Indeca were critical issues. They were briefed extensively by the parties.[3] This Court's focus on those matters in the Opinion was hardly a surprise.

Tucker essentially tries to approach summary judgment by stages, offering to provide this Court with evidence piecemeal—*after* this Court has ruled on the relevancy and adequacy of the already-presented evidence and *after* it has rendered its final decision. Rule 56 does not sanction such a hindsight approach in the summary judgment context, any more than a litigant could present evidence at trial and then—after having lost on the basis of that presentation—seek further discovery to adduce further evidence. See *Canada Dry Corp. v. Nehi Beverage Co.*, 723 F.2d 512 (7th Cir.1983).

---

**2.** It appears a number of the documents identified by Tucker were in fact presented to this Court in conjunction with the motions under consideration. Caceres' deposition was completed October 7, 1983, and Tucker was given until October 13 to file his supplemental memorandum.

**3.** See memoranda filed July 5, 1983 by Indeca, Continental and Tucker and answering memoranda filed July 18, 1983 by Continental and Tucker.

Tucker's arguments as to the need for more discovery are untimely raised. This Court reconfirms its grant of summary judgment in the Opinion.

### Indeca's Rule 54(b) Motion

■ Indeca moves for entry of final judgment against Tucker, Rumex, Bell and Ball under Rule 54(b):

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

In literal terms Rule 54(b) determinations are limited to judgments "as to one or more ... of the claims" or "as to one or more ... of the ... parties." Because this case does not literally involve either of those alternatives, this Court must first examine whether Rule 54(b) can apply at all. See *Bank of Lincolnwood v. Federal Leasing, Inc.*, 622 F.2d 944, 947 (7th Cir.1980).

One of the alternatives for invoking Rule 54(b) is the disposition of a single discrete "claim." On that score our Court of Appeals has said in *Local P–171, Amalgamated Meat Cutters v. Thompson Farms Co.*, 642 F.2d 1065, 1070–71 (7th Cir.1981) (citations omitted):

Rather than attempting to advance a general definition of what constitutes "separate claims," we conclude that a

---

**4.** "RICO" is the conventional shorthand for the Racketeer Influenced and Corrupt Organizations chapter (18 U.S.C. §§ 1961–1968) of the Organized Crime Control Act of 1970. Count VI charges a violation of 18 U.S.C. § 1962(c).

**5.** *Local P–171,* 642 F.2d at 1070 also speaks in terms of "the underlying facts potentially relevant to each" claim, and to "a definition of 'separate claims' as claims resting on entirely different facts" as constituting sort of an outside (and impermissible) standard. Any such focus on the *factual* similarities and differences in required proof would certainly lead to the conclusion that Indeca's state law charges against

---

better approach is to state rules of thumb to identify certain types of claims that clearly cannot be "separate," and otherwise rely on the sound discretion of district judges to make that determination on a case by case basis. At a minimum, claims cannot be separate unless separate recovery is possible on each.... Hence, mere variations of legal theory do not constitute separate claims.... Nor are claims so closely related that they would fall afoul of the rule against splitting claims if brought separately.

In those terms Indeca has two claims for relief:

1. its state law theories of breach of contract, fraud and negligence and

2. its RICO [4] claim.

Once Indeca recovers the amount it paid for the beans plus whatever incidental damages may also be recoverable on any one of the state law theories, it cannot recover that amount again from the same defendant on a different theory of liability. For example, Bell and Rumex have been found liable on both a breach of contract theory and a fraud theory—but that does not enable Indeca to collect twice its actual damages (say $10 million). Rather Indeca has a single state law right of recovery, though it advances a variety of legal theories to support that recovery. And that identical right of recovery—under the identical legal theories and involving the identical facts [5]—remains asserted and unresolved against *other* defendants in this action. Thus this Court's grant of summary judgment against Tucker, Bell, Rumex and Ball

defendants Nagel, Quosando and Lipani are not "separate claims" from the like charges against Tucker, Bell, Rumex and Ball. But the same cannot be said of the corresponding fraud charges against Continental Bank. Though the liability of all the other defendants is wholly independent of whether Continental was implicated in or totally innocent of the fraud, the converse is not at all true. Indeca has a whole set of added facts (and a set of added legal principles) to establish before it can tag Continental with liability, even though the labels of one or more of Indeca's legal theories (e.g., "fraud") may be the same.

could not represent a "final judgment" on—because it did not dispose of—any one "claim for relief." [6]

Thus for Indeca to succeed on its request for Rule 54(b) relief in the present posture of the case, it must bring itself within the other alternative under the Rule: a final decision as to the rights and liabilities of at least one of the parties.[7] "Final" in the Rule 54(b) context is the same as "final" under 28 U.S.C. § 1291 ("Section 1291"). 10 Wright, Miller & Kane *Federal Practice & Procedure: Civil 2d* § 2656, at 51–52. That concept has been stated succinctly by the Supreme Court in *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945), quoted in *Local P–171*, 642 F.2d at 1069:

> A "final decision" generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.

Summary judgment against Rumex, Bell and Tucker on Counts I and II did not "end the litigation on the merits" between Indeca and those defendants.[8] All three are also named in Count VI, the RICO count. Indeca essentially argues that a decision that "ends" the litigation on its merits as to one party's liability on one claim; leaving other claims against that party for future resolution, provides the requisite finality as to that party. This Court has found (though Indeca did not submit) one case to support that kind of claim-splitting against a single party for Rule 54(b) purposes. See *Rankin v. Howard*, 633 F.2d 844, 846–47 (9th Cir.1980) (permitting, albeit without any analysis of Rule 54(b)'s language, certification of a 42 U.S.C. § 1983 summary judgment while 42 U.S.C. §§ 1985 and 1986 and state tort law claims remained to be adjudicated against the same defendants). But any such general application of Rule 54(b) would read the finality concept out of the Rule, for it would effectively redefine

"claim for relief" to mean any one charge against any one defendant. It must be remembered Rule 54(b) cannot extend the scope of Section 1291. *Local P–171*, 642 F.2d at 1069 n. 4. In that light Indeca has not established this Court's grant of partial summary judgment "has resolved ... all the rights and liabilities of at least one party with finality." 10 Wright, Miller & Kane § 2659, at 96–97.

There is another basic flaw that precludes current Rule 54(b) certification. Tucker is right in pointing out the Opinion decided *liability* of the four defendants (Rule 56(c)) and not the specific amount of Indeca's *damages*. Though this opinion has rejected Tucker's argument Indeca has in fact suffered no damages, there has been no decision as to the precise measure of those damages—the precise number of dollars involved. That requires proof in the ordinary way.

Ordinarily the two preceding holdings would end the discussion, for the first hurdle of a potentially final dollar judgment has to be overcome before a district court "must decide whether to release its decision for appellate consideration by making an express determination that there is no just reason for delay." 10 Wright, Miller & Kane § 2659, at 97. But because Indeca could cure the threshold problems by (1) opting not to pursue its Count I and II claims against Nagel, Quosando and Lipani and (2) a simple proveup against Tucker, Bell, Rumex and Ball, it may serve judicial economy to look at the "no just reason for delay" question now.

Several factors have been identified by courts attempting to apply that standard, *Bank of Lincolnwood*, 622 F.2d at 949:

> The Third Circuit has compiled the following catalogue of relevant considerations along with the caveat that it is not all-inclusive:

---

6. Before the 1961 amendment to the Rule inserted the language regarding multiple parties, courts did not interpret each party-defendant relationship as constituting a single claim for relief. *Hardy v. Bankers Life & Casualty Co.*, 222 F.2d 827, 828 (7th Cir.1955).

7. In that respect the existence of crossclaims for contribution or indemnity among the defend-

ants does not affect the "finality" of any decision as to the rights and liabilities of any defendant vis-a-vis Indeca. See *Bank of Lincolnwood*, 622 F.2d at 950 n. 8.

8. Only Ball, named in Count II (the state law fraud claim) and no others, would qualify for the "final decision" test.

(1) The relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

*Allis-Chalmers [Corp. v. Philadelphia Electric Co.]*, 521 F.2d [360], 364 [(3d Cir.1975)].

Little discussion is required to see the direction in which those factors would point as applied to a final judgment on Counts I and II.

Two of the *Bank of Lincolnwood* anti-certification factors are not in this case at all. As for factor (2), the need to review the judgment against Tucker, Bell, Rumex and Ball plainly could not be mooted by future developments in this Court, either (1) on Indeca's state law claims against Continental or (2) on Indeca's RICO claim against any of the defendants. And there are no potential set-offs via claims or counterclaims against Indeca, so factor (4) also militates in favor of a current entry of judgment.

More importantly, the fifth group of factors also counsels toward rather than against entry of judgment now, given the amount of money involved and the length of time this case has already been pend-ing.[9] See *Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 11–12, 100 S.Ct. 1460, 1466–1467, 64 L.Ed.2d 1 (1980). It would be terribly unfair to force a plaintiff that has been adjudicated as having been wronged, and as having suffered $5 million in damages, to forego its possible RICO right to recover treble damages and to recapture its attorneys' fees, just in order to attempt to make itself whole now. Yet that coerced choice, compelling Indeca to forecast whether future developments might impair its ability to collect from its judgment debtors, would be the result of non-certification.[10]

That leaves for consideration *Bank of Lincolnwood* factors (1) and (3). Those two considerations tend to meld in analysis: the closer the relationship between the adjudicated and unadjudicated claims, the more likely the reviewing court might be obliged to consider the same issues again.

Even though Indeca's RICO count is predicated on the same sequence of events as Counts I and II, that alone does not preclude entry of judgment now. Those facts go to prove analytically distinct elements making up the two claims (contrast the elements of common-law fraud with the civil RICO requirements, see *United States v. Lemm*, 680 F.2d 1193, 1198–1201 (8th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983)). This Court's having found the judgment defendants guilty of fraud[11] may have brought Indeca closer to proving a RICO violation, but the fraud holding is surely neither a necessary nor a sufficient condition to success on the RICO claim.

In view of the separate legal inquiries posed by the two discrete claims, the rela-

---

**9.** Of course the reason Indeca seeks Rule 54(b) certification is to permit collection on its judgment now rather than being forced to wait. On the other side of the coin, defendants who seek Rule 54(b) certification typically do so to obtain an immediate appeal. *Bank of Lincolnwood*, 622 F.2d at 949–50 n. 7.

**10.** *Curtiss-Wright*, 446 U.S. at 12, 100 S.Ct. at 1467 made the obvious point that "if [the judgment debtor's] financial position were such that a delay in entry of judgment on [plaintiff's] claims would impair [its] ability to collect on

the judgment, that would weigh in favor of certification." With private parties rather than (as in *Curtiss-Wright*) General Electric as the judgment debtors, the risks of non-collectibility of a $5 million judgment are patent.

**11.** There is of course much less similarity between the Count I breach of contract elements and the Count VI RICO claim. Consequently the text analysis must apply a fortiori to the Count I claim.

tionship between them is not close enough to preclude entry of judgment on the first. By the same token, a reviewing court's analysis of the common law fraud claim would not present the same legal issues as a later review of the RICO claim.[12]

In sum, if Indeca were to cure the threshold problems previously identified, this case would qualify for entry of judgment under Rule 54(b). For the present, however, its motion must be denied.

### Conclusion

Tucker's motion for reconsideration is denied. Indeca's Rule 54(b) motion for entry of judgment is also denied, but without prejudice to its reassertion as and when the appropriate groundwork has been laid.

---

**12.** This is not to say the two claims are non-overlapping. But *Local P–171*, 642 F.2d 1070 teaches the absence of overlap is not the test. Indeed it confirms "that 'separate claims' for Rule 54(b) purposes can arise out of the same transaction...."